1       UNITED STATES DISTRICT COURT

2       SOUTHERN DISTRICT OF OHIO

3       WESTERN DIVISION

4                   - - -

5    UNITED STATES OF AMERICA,      :

6            Plaintiff,      : CRIMINAL NO. 1:05-CR-37

7      -vs-                  : Sentencing

8    J. PATRICK KISOR,       : Thursday, August 25, 2005
                                10:37 a.m.
9            Defendant.      : Cincinnati, Ohio

10                  - - -

11          TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MICHAEL H. WATSON, JUDGE

12                  - - -

13

14   For the Plaintiff:  William E. Hunt, Esq.
                         First Assistant United States Attorney
15                       221 East Fourth Street, Suite 400
                         Cincinnati, Ohio  45202
16

17   For the Defendant:  Glenn V. Whitaker, Esq.
                         Vorys, Sater, Seymour and Pease
18                       Atrium Two, Suite 2000
                         221 East Fourth Street
19                       Cincinnati, Ohio  45202

20

21

22
     Court Reporter:    Julie A. Wolfer, RDR, CRR
23
                            - - -
24

25

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

<u>PROCEEDINGS</u>

1

2          (In open court at 10:37 a.m.)

3               COURTROOM DEPUTY:  The next matter on the docket is

4    District Court Case Number 1:05CR37, U.S.A. versus J. Patrick

5    Kisor.

6               THE COURT:  Can I get a show of hands from the folks

7    back there, are there victims of Mr. Kisor in the court?

8               Thank you, sir.

9               Anyone else?

10              Okay.  You folks will get an opportunity to speak.

11              Gentlemen, if you'd come forward.

12              Mr. Kisor, you have a number of good friends.

13              THE DEFENDANT:  Yes, I do.

14              THE COURT:  Mr. Whitaker.

15              MR. WHITAKER:  Yes, sir.

16              THE COURT:  How are you?

17              MR. WHITAKER:  Thank you.  Good.

18              THE COURT:  You understand that we don't have all of

19   the restitution figures at this point, but Miss Jensen is

20   working diligently to get them.

21              MR. WHITAKER:  That's my understanding, Your Honor.

22   Mr. Hunt and I spoke about it this morning, and we're prepared

23   to proceed; and then, of course, the Court can modify the

24   restitution order as it deems necessary.

25              THE COURT:  Very well.

1          You've had an opportunity to review the presentence

2   report?

3          MR. WHITAKER:  I have, Your Honor.

4          THE COURT:  And, Mr. Kisor, you have as well?

5          THE DEFENDANT:  Yes, I have, Your Honor.

6          THE COURT:  Have all of -- if there were objections,

7   have they been resolved?

8          MR. WHITAKER:  Yes, sir.  There are no objections

9   pending.

10          THE COURT:  Very well.

11          Good morning, Mr. Hunt.

12          MR. HUNT:  Good morning, Your Honor.

13          THE COURT:  Mr. Whitaker, you want to go ahead and

14   make a mitigation statement on behalf of your client?

15          MR. WHITAKER:  Thank you, Your Honor.

16          Your Honor, the Court is aware that the Probation

17   Department has recommended in this case that the Court find 29

18   as the appropriate guideline level.  That is different than

19   what was contained in the plea agreement, but there has been no

20   objection by either side with respect to the finding of the

21   Probation Department.

22          If the Court chooses to strictly apply the guidelines,

23   certainly we would ask the Court to sentence at the low end of

24   the guideline range.  Of course, the Court now, pursuant to the

25   decisions from the Supreme Court, is free to impose any

1    sentence within the statute.

2           The Court has received numerous letters sent by

3    friends and family in this case which I think tell a more

4    complete story of Pat Kisor than the facts of the information

5    in the plea.

6           Your Honor, Mr. Kisor, as is detailed in the

7    presentence investigation report, is a man of humble origins

8    who started an investment business that clearly went awry, in

9    large part through his efforts but also in large part due to

10   the situation of the market.  Pat has proven over the years to

11   be a generous and kindhearted man who has given countless hours

12   of his time and money to charities, friends, church and

13   community, and all of that, Your Honor, is attested to, I

14   think, in detail in the letters that you have received.  He is

15   a very talented individual, an entrepreneur who we believe if

16   given an opportunity can and will make good on his promise to

17   repay every investor in this case.

18          Pat came to me, Your Honor, with his problems nearly

19   three years ago, I guess, at this point.  We discussed them,

20   and he opted to meet with the United States Attorney's office

21   and confess the investment losses and misuse of funds that

22   became the subject of the plea.  At the time that he came

23   forward, there were some investigations going on with respect

24   to Agave, but at least as far as Pat was concerned, he was

25   unaware of any criminal investigation by the United States

1    Attorney.  I'm not saying that there wasn't one, but as far as

2    he was concerned, he was not aware of it.

3              We met on several occasions with the agents.  Pat

4    always took full responsibility for his actions.  He never

5    attempted to cast blame on others, although I think that would

6    have been appropriate in some instances.  And I can tell the

7    Court that throughout my contact with him, his main concern in

8    all his conversations has been his investors and getting them

9    repaid.

10             As the Court can tell, and his family is here today,

11   Pat is a family -- loving, caring, family man.  He has five

12   children.  He has a very close family.  He has literally, Your

13   Honor, taken people into his home when they were in time of

14   need.  Just yesterday, one of his friends who is here today, a

15   lady named Pamela Winther who has submitted a letter to the

16   Court, sent me a letter documenting efforts that she has

17   engaged in over the past couple weeks to find unpaid employment

18   for Pat if the Court were to impose a sentence that would allow

19   him to stay in the community and work for various agencies that

20   would have unpaid employment for him.  And there are some.

21   There are some that are -- would be happy to have his expertise

22   and abilities.  And, again, of course, that is entirely up to

23   the Court as to how the Court wishes to proceed.

24             I can tell you, Your Honor, that Pat Kisor is deeply

25   sorry for his crimes.  He's been extremely remorseful in all of

1    my dealings with him.  He has had a gambling addiction and he

2    has sought treatment for that and continues to receive

3    treatment for it, and that, in part, led to some of the

4    situations that we have.

5              The money loss --

6              THE COURT:  How long has he had a gambling addiction?

7              MR. WHITAKER:  How long, do you --

8              THE DEFENDANT:  Probably since about 1990.  That's

9    when I started gambling.  I didn't know -- I didn't recognize

10   the addiction until later.

11             THE COURT:  Thank you.

12             MR. WHITAKER:  Your Honor, there clearly has been a

13   number of diversions of funds.  We've admitted to all of that.

14   I know that the United States Attorney has prepared charts with

15   respect to that.  There's never been any dispute about it.  The

16   only dispute with respect to a portion of it which is about 3.6

17   million of the 8 million dollars that's referred to in there is

18   that a lot of that money went to others who were working with

19   or associated with Mr. Kisor, but clearly it was his

20   responsibility and he's admitted all of that and takes full

21   responsibility for it.

22             Your Honor, the only thing I would say is that, again,

23   if the Court follows the guidelines, we would ask for the low

24   end of the guideline range as a sentence; but we would ask the

25   Court to exercise its newly recognized discretion in this case

1 and impose a sentence that will allow Pat back into the work

2 force as quickly as possible so that he can repay the

3 investors. And I can assure the Court that is his intention

4 and that is what he expects to do over the coming years.

5     THE COURT: Thank you.

6     Mr. Kisor, what do you have to say, sir?

7     THE DEFENDANT: I'm deeply sorry for the things that I

8 did. I take full responsibility for my actions. I apologize

9 to my investors, to the Court, to society at large, and to my

10 family. And I will work the rest of my life to repay the money

11 that has been taken and to try and rebuild the trust that I

12 broke.

13     That's all.

14     THE COURT: Thank you.

15     Mr. Hunt.

16     MR. HUNT: Your Honor, thank you for the opportunity.

17     May I have a moment? I do have a chart I'd like to

18 show to the Court.

19     THE COURT: Thank you.

20     MR. HUNT: While we're getting that, I would say for

21 the record that I've shown this to Mr. Whitaker. He is aware

22 of it. But I do want to take an opportunity to kind of

23 emphasize to the Court the nature of this case.

24     While we are waiting for the chart, I would say that

25 Mr. Kisor accepted money from a number of different victims, a

1  lot of whom were well-to-do, prominent members of the

2  community, as the Court is aware of that.  Here in court today

3  is an attorney for one of the victims that I think might want

4  to speak to you.

5         If you don't mind, Glenn, I'll just put that here.  I

6  think the Judge can see this where it is.

7         THE COURT:  I can see it.

8         MR. HUNT:  There is an attorney present, Jeffrey

9  Bakst, who represents Dr. Errol Stern, a prominent surgeon here

10 in town.  He was one of the people that invested money.  There

11 are a lot of people like him that are well-off in the

12 community.  But I also wanted to tell the Court that one of the

13 victims was a young man by the name of Nicholas Kroehner.  He's

14 on the list.  He was in a motorcycle accident, Your Honor, and

15 received a settlement, some $200,000, which he invested with

16 Mr. Kisor.  That money is lost.  Mr. Kroehner does not have the

17 ability, like some of the other victims, to go out and make

18 large amounts of additional money because he had to drop out of

19 school, didn't have the ability to pay tuition, and is right

20 now struggling.  So there is a wide variety of people that were

21 affected by this activity.

22        Now, Mr. Whitaker, and I understand his point of view,

23 wants to cast this as investment losses.  However, we're not

24 here to talk about the money that was lost through bad

25 investments.  We're here to talk about the money that Mr. Kisor

1    stole and he used it for his own personal reasons, personal

2    housing expenses, luxury vehicles, clothing, jewelry, gambling

3    losses, vacations, et cetera.  So while the people who invested

4    the money could reasonably accept some risk from their

5    investment, they certainly didn't contemplate that the person

6    with whom they were investing would actually just take the

7    money and use it for himself.  As you can see from the chart

8    the different categories that add up to over eight million

9    dollars.  Not bad investments but actual diversion from the

10   investments.

11          Now, I know that the Court takes a lot of time and

12   puts a lot of thought into an appropriate sentence in these

13   cases.  We understand that the guidelines offer a range.  I

14   know the Court has discretion.  But I think the Court should

15   seriously consider the guidelines because they do represent a

16   lot of the factors that the Court should consider in

17   determining what's appropriate in this case, not only from the

18   standpoint of consistency throughout the country and the types

19   of sentences that should be awarded but in deterrence and

20   actual punishment for these crimes.

21          Mr. Kisor, while he, I'm sure, is sincere in his

22   desire to pay back the money, he can't pay back the money.

23   These people are out.  And while there may be some compensation

24   through a receiver and all of that, eventually it's still going

25   to amount to just pennies on the dollar, Your Honor, and I'm

1  sure the Court is aware of that, Mr. Whitaker is; and as much

2  as Mr. Kisor tries, it will take a long time for him to come up

3  with the eight million dollars that represent the loss in this

4  case.  So I want the Court to take all of that into

5  consideration in arriving at an appropriate sentence.

6           THE COURT:  Mr. Hunt --

7           MR. HUNT:  Yes, sir.

8           THE COURT:  -- does he face additional issues with the

9  IRS at this point?

10          MR. HUNT:  One of the provisions of the plea agreement

11 was for Mr. Kisor to file appropriate tax returns for the years

12 in question within 120 days of his plea.  That time has come

13 and gone.  We have checked.  He has not filed.  Mr. Whitaker

14 tells me that he is in the process of getting that together and

15 I believe that's true, but he has not yet made amends with the

16 IRS.  Whether there will be additional criminal charges, I

17 doubt, but he will have some financial liability with them.

18          MR. WHITAKER:  Your Honor, if I may speak to that.

19 Part of the problem is is that Mr. Kisor's records weren't

20 great to begin with and what he had is now in the possession of

21 the government.  And he's trying to reconstruct, and it's

22 difficult because obviously he doesn't want to file something

23 that's incorrect, and that is the problem in these kinds of

24 cases.  But he will continue to try to do that.

25          THE COURT:  So a restitution figure, it seems to me

1    the restitution figure is in the six-million-dollar range here;

2    correct?

3              MR. WHITAKER:  It is, Your Honor, as contained in the

4    PSIR.

5              THE COURT:  On top of that, he's going to have

6    probably significant additional tax liability; correct?

7              MR. WHITAKER:  I believe so, Your Honor.

8              THE COURT:  And penalty and interest.

9              Okay.  Are there victims that would like to speak?

10              Sir, if you'd approach the podium, state your name for

11    the record.

12              MR. BAKST:  Good morning, Your Honor.  My name is

13    Jeffrey Bakst.  I'm an attorney here representing one of the

14    victims, Dr. Errol Stern, who is a active practicing orthopedic

15    surgeon who has a full orthopedic schedule this morning or he

16    would be here.  And he just wanted me to come and let you know

17    there's another side to this story.

18              We hear that this was investment losses, but from

19    Dr. Stern this man took $500,000, blatantly stole it.  He just

20    stole it.  He never -- he didn't invest it.  And we filed a

21    civil suit, and when it wasn't stayed, it's stayed right now

22    because of the SEC suit that's in a different court, but when

23    it wasn't stayed, we didn't get, well, we'll consent to a

24    judgment; they fought us.  Dr. Stern's never heard an apology

25    from this man.  No remorse whatsoever from this man.  And he

1   took a piece of Dr. Stern's retirement money, and he wants the

2   Court to know that this man -- it wasn't a bad investment, it

3   was a blatant theft, and we would ask for restitution, Your

4   Honor.

5          THE COURT:  Thank you.

6          MR. BAKST:  That's all we have.

7          THE COURT:  Thank you.

8          Anyone else?

9          Sir.

10         MR. DRABEK:  Good morning.  Good day.  My name is

11   Dennis Drabek.

12          I was not only an investor in Pat's organizations but

13   at one point in time I was a confident, or I thought I was a

14   confident.  It's nice for him to have Mr. Whitaker as his

15   counsel.  The sale of a Rolls-Royce -- excuse me, I'm a little

16   nervous -- the sale of a Hummer, investors' money to pay for

17   his legal counsel.  Eight million.  It's in excess of sixteen

18   million.  That's in another court.

19          He's a thief.  He uses his church to cover.  I sat in

20   meetings where he spoke of the Lord and setting up 150 million

21   dollars.  He had told everyone he had in excess of a hundred

22   million dollars sitting inside an account.  He used his church,

23   he used his friends, his confidants.  He's using his attorney

24   to bamboozle this Court.

25         THE COURT:  I don't feel bamboozled, but go ahead.

1     MR. DRABEK:  But I'm listening to what's being

2    presented quite eloquently by Mr. Whitaker, and it's so far

3    from the truth.  I think Mr. Kisor is a generous individual.

4    It's easy to be generous with other people's money.

5            I feel bad for his wife and his family.  I feel bad

6    for the people that were kind enough to write letters on his

7    behalf because they truly don't know him.  He may have remorse

8    now that he's going to prison.

9            Once he knew it was over, I believe it was a hundred

10   thousand in one week.  New Mini Cooper, a new B-Rod

11   Harley-Davidson.  Who knows how much cash was spent, the money

12   wasted in Las Vegas.  The moneys lost are far in excess of

13   eight million dollars.  There are other investors, they're too

14   embarrassed to appear in this court.  They're too embarrassed

15   to stand at this podium.  I wish I wasn't standing at this

16   podium.  But someone needs to speak other than the eloquent

17   Mr. Whitaker.

18            THE COURT:  I appreciate --

19            MR. DRABEK:  I wish his family the best.  Hopefully

20   they do well.  That's where the sorrow and pity needs to go.  I

21   just hope the Court sees justice in this.

22            Thank you.

23            THE COURT:  Sir, your loss is what?

24            MR. DRABEK:  I can't put a dollar amount on my loss at

25   this point because I don't have all the records from the

1  government.  I was being paid moneys, amount I can't put on it,

2  but it's in excess of seven figures.  More than seven figures.

3  Thank you, sir.

4  THE COURT:  Thank you, sir.

5  Miss Jensen, are you working with Mr. Drabek?

6  PROBATION OFFICER JENSEN:  I will be, yes.

7  THE COURT:  Thank you.

8  Mr. Kisor, I have not accepted your plea yet.  I want

9  you to understand that if I impose a sentence that's greater

10  than you anticipate, you can't withdraw your plea.  Do you

11  understand that?

12  THE DEFENDANT:  I do understand that.

13  THE COURT:  Do you wish to go forward with your plea

14  at this time?

15  THE DEFENDANT:  Yes, Your Honor.

16  MR. WHITAKER:  Your Honor, if I might have just one

17  moment of response.

18  I have absolutely no quarrel with Mr. Bakst and his

19  client.  Certainly Mr. Bakst did the best he could for his

20  client and his client deserves to be repaid.  I have nothing to

21  comment with respect to him.

22  However, Mr. Drabek is an entirely different story.

23  Mr. Drabek introduced Mr. Kisor to Keith Mohn, and that's

24  reflected in the PSIR.  Mr. Drabek received substantial amounts

25  of money from the amounts that are referred to here with

1    respect to 3.6 million dollars.  Our estimate is that he's

2    received as much as $750,000 and various kinds of gifts from

3    Mr. Kisor along the way.  He used Mr. Kisor's credit cards

4    repeatedly for his own personal use.  Throughout this,

5    Mr. Kisor could have shifted or attempted to shift blame to

6    Mr. Drabek.  He didn't do that, Your Honor.  Mr. Drabek was a

7    participant in all of the fraudulent activity, or much of it,

8    at least, that is the subject of this fraud indictment.

9            So with -- there are many, many victims in this case

10   and we don't diminish their loss in any way, but I will tell

11   the Court that Mr. Drabek is not among them.

12           THE COURT:  Any other victims wish to speak?

13           Ma'am.  Come forward, if you would.

14           MS. TURBA:  Your Honor, Liz Turba.  I'm an investor.

15           And I must preface this by saying that I knew Pat

16   Kisor when he drove a Ford Pinto with the muffler hanging off,

17   installing audio visual equipment in my home.  We had many,

18   many long discussions about family, about spirituality, about

19   life.  He sat at my dinner table.  And now he's taken my

20   children's inheritance.  This was money from a divorce that I

21   can never recover.  As a single mother now, I was forced to

22   sell my home in Amberly, move to a condominium, move my

23   children because I could no longer afford.  And I'm one of the

24   least.  I'm hearing when we sit around in court in Michigan to

25   try to recover the losses with the receiver, I'm hearing

1     stories from people about they couldn't afford cancer

2     treatment.  And as a cancer nurse, I have nothing but feelings

3     of helplessness in this case that I even knew Pat and I thought

4     I knew him very well, but it turned out that I'm not sure that

5     I can believe anything that came out of his mouth.  And I

6     really -- it took me a lot of courage to come up here today

7     because of my position in the community, but I feel it's

8     important for Pat to understand that this is not something that

9     requires a year of probation.  It's affected numerous lives,

10    destroyed lives.

11            Thank you, Your Honor.

12            THE COURT:  Thank you, ma'am.

13            Anyone else?

14            Counsel approach.

15      (Sidebar conference held off the record with counsel.)

16            THE COURT:  For the record, the Court's discussed with

17    counsel the other civil litigation that's pending, the

18    potential for additional criminal actions, and so forth.

19            So, Mr. Kisor, is there anything you'd like to discuss

20    with Mr. Whitaker about our conversation before we proceed?

21            THE DEFENDANT:  No, Your Honor.

22            THE COURT:  All right.  In the lion's share of the

23    cases that I accept pleas of guilty in, I accept the plea at

24    the time that it is entered.  This is not your garden variety

25    fraud, and that is why I held off accepting the plea until

1     after I reviewed the presentence report and had an opportunity

2     to hear from the victims or some of the victims.

3          Mr. Kisor, you have clearly been attuned to all of the

4     questions that I've asked of you, you have appeared to give

5     straightforward responses, based upon what Mr. Hunt has

6     explained you have been forthcoming for several years with

7     information about your crimes.

8          My review of the presentence report, to the extent

9     that it has been able to contact folks willing to talk, to the

10    extent that Miss Jensen has been willing and able to contact

11    folks willing to talk, discloses that you have a number of

12    friends and folks you've met in the course of your dealings

13    with your church who are big fans, but they also recognize that

14    you have to pay a penalty for your actions.

15         I've observed you throughout these proceedings.

16    You've responded directly to my questions.  I'm satisfied that

17    you are in full possession of your faculties; that you're not

18    suffering from any apparent physical or mental illness as you

19    stand here today.  You don't appear to be under the influence

20    of narcotics or alcohol.  You seem to clearly understand the

21    nature of these proceedings, the charges involved, the

22    consequences of your plea of guilty.  I suspect based upon

23    representations that have been made that you're fully aware of

24    all plea negotiations that have been undertaken in your behalf;

25    correct?

1    THE DEFENDANT: Yes, Your Honor.

2    THE COURT: Accordingly, I'm finding that you are

3 fully competent and capable of entering into an informed plea;

4 that your plea of guilty is a knowing and voluntary plea

5 supported by an independent basis in fact containing each of

6 the essential elements of the offense. Your plea is therefore

7 accepted. You are now adjudged guilty of the three offenses to

8 which you have entered pleas and now stand before the Court for

9 sentencing.

10    For the record, the Court has reviewed the presentence

11 report, the sentencing memorandum prepared by Mr. Richardson

12 and Mr. Whitaker. I've reviewed letters from Bishop Michael

13 Harward, Keith Jensen, brothers David Kisor and your father, I

14 believe, as well, your wife, Denise Kisor, Gregory Hurst Kisor,

15 Mike Lane, Randy McGladrie, Mike Nakata, Eugene Northrop, Janet

16 Northrop, Kevin Rutter, Mr. Anthony Strike, Pamela Winther, Jim

17 Zaya, one filed yesterday from a Leroy Moster. A letter --

18 well, all of these have been favorable. A letter from the

19 Pushmans which indicates that they are out of combined total of

20 $200,000, they are senior citizens who have lost a significant

21 percentage, I believe, of their retirement fund. And I don't

22 know at this point whether they've received any moneys back

23 from Agave.

24    Miss Jensen, do you know?

25    PROBATION OFFICER JENSEN: Your Honor, I don't have

1    that information with me right now.  I will verify if they've

2    received any money.

3              THE COURT:  I don't know if this letter has been

4    filed.  It is a May 7th letter.  I'll give you -- yes, it is

5    listed on your -- it's listed on your list.  Good enough.

6              You know, you've admitted here today to the vice of

7    gambling beginning in 1990.  It's true that people lost money

8    in a market downturn, but what -- that may explain some of

9    this, but what is inconsistent with all of the letters that

10   have been written in support is the behavior that led to

11   two-and-a-half million dollars of gambling losses or the

12   purchase of 1.75 million dollars in vehicle purchases, payments

13   on a home in apparently the Virgin Islands, 3.625 million

14   dollars of other personal expenditures.  It's a whale of a lot

15   of money.  It's 8.092 million dollars of funds that the

16   government claims are diverted for personal expenditures.  I

17   don't know how you ever will repay that.  You've saddled your

18   family.  I don't think you've crippled your family, although

19   you've crippled some families, in terms of their ability to go

20   forward and to live comfortably.  Clearly, some of these

21   victims were investors that could afford -- could afford to run

22   the risk of their investment, but I don't think any of them

23   expected to be victims of theft.  I think they could anticipate

24   the risks in the marketplace, but I don't think they could

25   anticipate the risk that you would steal from them.  And,

1      obviously, that's what brings you here.

2              18 United States Code Section 3553(a) indicates that

3      there are a number of factors that I shall consider in imposing

4      sentence.  It begins by stating that the Court shall impose a

5      sentence that is sufficient, but not greater than necessary, to

6      comply with the purposes that are set forth in paragraph (2).

7      In addition, I have to consider the nature and circumstances of

8      the offense, the history and characteristics of the defendant.

9              Everything I know about your history is that you and

10     your wife come from essentially middle-class homes.  You're the

11     product of divorce, like a number of other people.  It is

12     unfortunate.  It doesn't explain how you've become a thief.

13     You appear to be very active in your church.  You appear to

14     have been very forthcoming with your money, willing to help

15     virtually anyone.  That is to be commended.  Those are traits

16     that I suppose will hopefully inure to the benefit of your

17     family while you're away.

18             I have to consider the sentence that I impose reflects

19     the seriousness of the offense, that it promotes respect for

20     the law, that it provides just punishment for the offense,

21     affords adequate deterrence to any future criminal conduct.

22     I'm not concerned about that really.  I don't believe you're

23     going to be in a position in the future to wreak this kind of

24     financial havoc again, but, nonetheless, it is a factor that I

25     have considered.

1    (C) kind of goes hand in hand with (B) in terms of the

2    need to protect the public from further crimes of the

3    defendant.  You're not a violent criminal, but your acts have

4    done great violence in a number of homes.

5    The Sentencing Guidelines provide for probationary

6    sentences and they provide for prison sentences and they

7    provide for split sentences, and you don't qualify for a

8    probationary sentence.

9    The guidelines are to be treated as advisory, but in

10   more cases than not I have tried to adhere to those guidelines

11   because I think they are instructive and they do help guide the

12   Court in the exercise of its discretion in most instances.

13   Mrs. Kisor, I would say this to you:  I apologize for

14   what I have to do, but I don't apologize in the same vein.  I

15   feel badly for you and your family and what your children will

16   have to endure as a result of your husband's crimes.  At the

17   same time, the victims have suffered significant loss, and that

18   must be addressed.

19   Two-point-some-odd million dollars to the Bellagio for

20   gambling losses, a Rolls-Royce, a Lamborghini, and two Vectors.

21   I suspect at this point, Mr. Kisor, you realize that

22   when you lay in your grave, you can't take it with you.

23   THE DEFENDANT:  Yes, Your Honor.

24   THE COURT:  And the pursuit of material gain will

25   destroy, if you let it, and you've done a whale of a job.

1        The agreed-upon base offense level, I believe, was 30,

2    and the Court so finds.  However, appropriate Sentencing

3    Guideline is 2B1.1(a).

4        I stand corrected.  The base offense level is 6.

5    Because of the specific offense characteristics, we add 20

6    points.  And because you defrauded approximately 140 investors,

7    there's an additional increase of four levels because the

8    offense involved more than 50 victims.  So that gets us to 30.

9        There is an additional adjustment for your role in the

10    offense of two points which really takes us to 32.

11        You're being given credit under the guidelines of an

12    additional two points for acceptance of responsibility and an

13    additional one point because you went to the authorities to

14    notify them of your own misconduct.  So that's how we get to

15    29.

16        You don't have a criminal history, juvenile or

17    otherwise, which means that you are a 29 offense level adjusted

18    and a criminal history category of I.

19        To Amanda, Lehla, Josef, Jameson, and Jackson, I

20    apologize for having to sentence your father to prison, but he

21    has richly deserved this by his actions, and I believe he's

22    told you that.

23        As you know, Mr. Kisor, the sentencing range for a 29,

24    category I is between 87 months and 108 months as to Count 1.

25    It is 60 months for Count 2.  It's one to three years as to

1   Count 3.

2           J. Patrick Kisor, I hereby commit you to the custody

3   of the United States Bureau of Prisons for a term of 90 months

4   in Counts 1 and 3 -- I misspoke previously -- Counts 1 and 3,

5   and 60 months as to Count 2.  All three of these sentences will

6   be served concurrently to each other.

7           Following a sentence of imprisonment, you will be

8   placed on supervised release.  You will be placed on supervised

9   release for the maximum period of time available under the

10  statute which is three years for this -- these crimes.

11          Within 30 days of the commencement of your term of

12  supervised release, the probation officer will recommend a

13  payment schedule that will -- to me that will enable you to

14  begin to pay the special assessment of a hundred dollars on

15  each of the three counts that you've pled to, so $300, and to

16  pay the restitution figure.

17          As a condition of supervised release, you shall not

18  commit any federal, state, or local crime.  You're prohibited

19  from possessing a firearm or other dangerous device.  You shall

20  not possess any illegal controlled substances.  The mandatory

21  drug testing condition is waived due to defendant's lack of

22  prior substance abuse that I'm aware of.  You are to otherwise

23  comply with all the standard conditions of supervised release.

24  And you are to make regular payments on the restitution figure

25  that I will impose.

**24**

1    Unless I'm advised otherwise, I see no reason to

2  collect your DNA.

3    PROBATION OFFICER JENSEN:  Your Honor, because this is

4  a felony conviction, the law says we have to.

5    THE COURT:  I've been advised otherwise.  Therefore,

6  we're going to collect your DNA.  Okay.

7    Thank you.

8    You're to continue to provide all requested financial

9  information to Miss Jensen.

10    When you get out, you shall not engage in an

11  occupation involving investments, at least not without prior

12  permission of the Court, nor open any new lines of credit

13  without permission of the probation officer.

14    It's my understanding you have surrendered all the

15  assets you have.  Is that correct?

16    THE DEFENDANT:  Yes.

17    THE COURT:  Now, you and your wife -- you started a

18  couple of businesses; correct?  Are those ongoing concerns?

19    THE DEFENDANT:  Yes.

20    THE COURT:  You started them or your wife started them

21  or your family started them, what happened?

22    THE DEFENDANT:  My -- my wife started them.  I just

23  assisted her in starting them with labor and work.

24    THE COURT:  The recommended restitution figure at this

25  point is six point nine zero one six seven four million dollars

1    and thirty-one cents.  That number will increase.

2             Miss Jensen has requested an additional 90 days to

3    contact additional individuals who may be victims in this case

4    to assign their losses as restitution, and she will need to

5    confirm that and so the Court will grant that additional 90

6    days.

7             You shall participate in the inmate financial

8    responsibility program during your incarceration, and to the

9    extent that we can start a payment plan, albeit small, while

10   you're in prison, you'll start paying a portion of your prison

11   salary to reduce your obligation.

12            You have a right to appeal my sentence if you believe

13   that it is illegal in any way, as does the government.  You

14   have ten days from today's date within which to do that.

15            Mr. Whitaker, I would ask that you are retained

16   counsel, that you would protect your client's appellate rights

17   in that regard.

18            MR. WHITAKER:  I will, Your Honor.

19            THE COURT:  Very well.

20            Anything further on behalf of the government?

21            MR. HUNT:  Your Honor, there is one technical matter

22   that Mr. Whitaker and I would like to discuss with you at the

23   sidebar.

24            THE COURT:  Yes.

25   SIDEBAR CONFERENCE

1    MR. HUNT:  I didn't want to do this in open court, but

2    I think when you announced that the restitution would begin as

3    part of the supervised release, I think you should change that

4    to make it due and payable in total immediately because I don't

5    think you meant that.

6    THE COURT:  Well, yeah.  And I was conflicting there

7    at the end too.

8    MR. HUNT:  So I don't know how you want to clean that

9    up, but usually the restitution orders are --

10    THE COURT:  I'll --

11    MR. HUNT:  -- are payable immediately.

12    THE COURT:  I'll just clear that up.

13   SIDEBAR CONFERENCE CONCLUDED

14    THE COURT:  Mr. Kisor, I want to clarify for the

15   record that the restitution figure of at least 6.9 million

16   dollars as I previously stated is due immediately.  Therefore,

17   the provisions we were talking about with inmate financial

18   responsibility, your obligation to begin to pay starts today.

19   All right.

20    I do believe that will be all.

21    MR. WHITAKER:  Your Honor, just a couple of things, if

22   we might.

23    First of all, could Mr. Kisor have a voluntary report?

24    THE COURT:  Yes.

25    MR. WHITAKER:  And, secondly, would the Court

1    recommend the Ashland facility as the facility because of its

2    proximity to his home?

3              THE COURT:  All I can do is recommend that, as you

4    know.

5              MR. WHITAKER:  I understand.

6              THE COURT:  And, yes, I will do that.

7              MR. WHITAKER:  Thank you, Your Honor.

8              THE COURT:  Anything further, Mr. Hunt?

9              MR. HUNT:  No, Your Honor.  Thank you.

10             THE COURT:  Mr. Whitaker?

11             MR. WHITAKER:  Nothing further, Your Honor.

12             THE COURT:  That will be all.

13        (Proceedings concluded at 11:37 a.m.)

14                                - - -

15

16                      C E R T I F I C A T E

17             I, Julie A. Wolfer, the undersigned, do hereby

18   certify that the foregoing is a correct transcript from the

19   record of the proceedings in the above-entitled matter.

20

21                          s/Julie A. Wolfer
                            Julie A. Wolfer, RDR, CRR
22                          Official Reporter

23

24

25